**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Janine Conroy, as the Trustee for the heirs of Matthew Joseph Conroy,

Plaintiff,

v.

Civil No. 01-1626 (RHK/RLE)
**MEMORANDUM OPINION AND ORDER**

Lynn Dingle, individually and in her official capacity as Warden of the Minnesota Correctional Facility/ Moose Lake, et al.,

Defendants.

---

Joel A. Montpetit, Montpetit, Freiling & Kranz, Saint Paul, Minnesota, for Plaintiff.

Jennifer A. Service, Assistant Attorney General, Saint Paul, Minnesota, for Defendants.

---

## Introduction

On September 7, 1998, Matthew Joseph Conroy was struck in the neck and killed as a fight broke out between rival groups of inmates at the Minnesota Correctional Facility-- Willow River/ Moose Lake ("the Moose Lake facility"). This action, brought by Conroy's heirs under 42 U.S.C. § 1983, alleges that Warden Lynn Dingle, acting in her individual capacity, violated Conroy's Eighth Amendment rights by failing to protect him from the fatal assault. Dingle now moves for summary judgment on the grounds (1) the evidence does not demonstrate the "deliberate indifference" required to establish a

FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. OCT 1 1 2002
DEPUTY CLERK

constitutional violation, and (2) she has qualified immunity from suit. Because the Court concludes there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law, the motion will be granted.[1]

**Background**

Matthew Conroy was committed to the Moose Lake facility on July 16, 1998, to serve a sentence for drug-related convictions. (Defs.' Br. at 2.) Because Moose Lake is a medium security prison, inmates are given a fair amount of freedom to move between locations within the prison grounds. (Service Aff. Ex. B (Benson Aff.) at 2.) That does not mean, however, that such facilities are free from racial or gang violence. As of September, 1998, prison staff monitored several groups as "Security Threat Groups," including the Prison Motorcycle Brotherhood, the Solid White Brothers, the Gangster Disciples, the Vice Lords, the Latin Kings, the Native Americans, the Bloods, and the Crips. (Montpetit Aff. Ex. A (Defs.' Ans. to Pl.'s Interrog. No. 4).) A dispute between members of two of these gangs sparked a series of conflicts that culminated in Conroy's

[1] Conroy's heirs originally also brought this action against Dingle in her official capacity and Sheryl Ramstad Hvass in her capacity as Commissioner of Corrections. Conroy's heirs now concede that the Eleventh Amendment bars these claims, and therefore, the Court will dismiss them without prejudice. Conroy's heirs originally also brought this action against Fred LaFleur, individually and in his capacity as former Commissioner of Corrections, and John Does I and II. Conroy's heirs, however, have neither advanced evidence regarding nor devoted briefing to these claims. The Court therefore deems these claims abandoned and accordingly will dismiss them with prejudice.

death. (See Service Aff. Ex. A (Pl.'s Ans. to Defs.' Interrog. No. 4) at 2-5.)

On the evening of September 6, 1998, Kenny Keys, an African American member of the Vice Lords, made a disparaging remark about the haircut of Jerry Critenden, a Caucasian member of the Prison Motorcycle Brotherhood. (Id. at 2.) As the dispute escalated, Keys said, "you know, you better watch how you talk to me before I snap on you and send someone after you." (Id.) Overnight, the dispute became the talk of the prison. (Id.) On the morning of September 7, while Critenden and two other Prison Motorcycle Brotherhood members were returning from the gym, Keys and five or six other African American prisoners approached. (Id. at 4.) Keys pointed at Critenden and said, "That's the guy." Critenden was knocked to the ground and kicked repeatedly. (Id.) Critenden's associates ran to find other members of their gang. According to one:

> The group that I am with is yelling out to people saying, hey man, come down here . . . we've got something to talk about . . .. [A]ll these other guys . . . came out of the door and they started saying, is this the one is that the one? Keys was there again. All the blacks are there, all the blacks are there. And we were surrounded by all these black guys.

(Id. at 5.) At that point, an altercation broke out between the African American and Caucasian prisoners. (Id.) During the fight, Conroy, whose presence in the area was unrelated to the dispute, was struck on the neck and killed. (See Service Aff. Ex. A (Pl. Ans. to Defs.' Interrog. No. 5).) An ambulance transported him to Mercy Hospital but medical care proved futile. Conroy died as a result of his injuries. (Service Aff. Ex. C at

6.) Three years later, his heirs filed suit.

## Standard of Review

A party is entitled to summary judgment if the evidence demonstrates that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law. See Tucker v. Evans, 276 F.3d 999, 1001 (8th Cir. 2002). In viewing the evidence, the Court makes its inferences in the light most favorable to the nonmoving party. See Enterprise Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996); see also Adkinson v. G.D. Searle & Co., 971 F.2d 132, 134 (8th Cir. 1992). The burden is on the moving party, see Enterprise Bank, 92 F.3d at 747; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), and summary judgment should be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. See Liberty Lobby, 477 U.S. 242, 250 (1986). In essence, the court performs a threshold inquiry to determine whether there is need for trial. Id. at 250.

## Analysis

Dingle's motion poses two questions. The first is whether the evidence, taken in the light most favorable to Conroy's heirs, shows a violation of a constitutional or statutory right. See Saucier v. Katz, 533 U.S. 194, 201 (2001). The second is whether that right was so plainly established as to make it clear to a reasonable officer that his or her conduct was unlawful. See Treats v. Morgan, 2002 WL 31055497 at *2 (8th Cir. Sept.

17, 2002). Summary judgment is appropriate unless the answer to each of these questions is yes.

Dingle maintains that Conroy's heirs have failed to show the deliberate indifference required to establish a failure-to-protect claim under the Eighth Amendment. In addition, Dingle asserts that even if there was such a claim, she is protected by qualified immunity. In response, Conroy's heirs assert that prison officials were aware of the growing risk of gang and racial violence at the Moose Lake facility. Moreover, the heirs aver, Dingle's failure to confront this risk was so egregious as to render her personally liable for damages.

## I. Failure to Protect

Under the Eighth Amendment, prisoners have a clearly established right to be protected from violence by other inmates and prison officials must take reasonable measures to ensure their physical well-being. Farmer v. Brennan, 511 U.S. 825, 833 (1994). A failure-to-protect claim has an objective component, whether there was a substantial risk of harm to the inmate, and a subjective component, whether the prison official was deliberately indifferent to that risk. See Jackson v. Everett, 140 F.3d 1149, 1151 (8th Cir. 1998). While Conroy's heirs may be able to establish a question of fact as to substantial risk, they have not advanced the evidence of personal knowledge necessary to survive summary judgment on deliberate indifference.

Conroy's heirs allege that racial and gang-related animosity between rival groups of prisoners at the Moose Lake facility posed a substantial risk to Conroy's safety. Without doubt, the incident reports for the weeks prior to Conroy=s death detail several incidents with ominous overtones. On August 25, 1998, for instance, an officer reported:

> [A]t 0855, [redacted] came to the U-54 staff desk and asked to talk with me . . . . He said that there was some writing again on the bathroom toilet stall, Asome racial stuff. He walked with me to the far east restroom and pointed out on the outer toilet area, the metal stall wall between having scratched into it as follows: "START THE DAY RIGHT KILL A NIGGER" then along side of that "LET'S FUCK THE [redacted]."

(Montpetit Aff. Ex. A (Incident Reports) at 137.) On August 28, 1998, another officer reported:

> [A]t 1854 hrs. I heard a loud noise come from the 3NC pod. Inmate [A] was out on exercise at this time so I switched the camera over to that pod to monitor. When I did this, I immediately saw Inmate [A] hitting Inmate [B]'s cell door with an open hand. I immediately instructed Inmate [A] to switch in. He complied w/out incident. At 1940 hours, at the conclusion of [exercise], I went to interview both Inmates [A & B]. Inmate [B] told me that Inmate [A] had referred to him with racial slurs and then threatened to get [B] with a shank (specifically his toothbrush).

(Montpetit Aff. Ex. A at 140.) On September 1, 1998, a third officer reported:

> Today, at approximately 1000 hrs, inmate [C] came to my office . . . regarding information he heard in the yard about inmate [D]. [Inmate C] said there are people from the Hispanic group and from the Vice Lords saying inmate [D] will get hurt when he is released from Segregation.

(Montpetit Aff. Ex. A at 145.) Whether incidents of this nature constitute an escalating cycle of racial and gang-related conflict that posed substantial risk of serious harm to Matthew Conroy may well present a question of fact for the jury.

While this risk might have been real and substantial, Conroy's heirs are unable to show deliberate indifference, the subjective component of this inquiry. In order to prove deliberate indifference, the plaintiff must demonstrate that the prison official actually knew of and disregarded an excessive risk to inmate health or safety. Farmer, 511 U.S. at 837. Whether a prison official had the requisite knowledge is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious. Id.

Conroy's heirs assert that the surfeit of racial and gang-related material in the incident logs demonstrates that the risk of violence should have been self-evident to Dingle. The Eighth Circuit has repeatedly held, however, that "a general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability." See Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995); Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987); Glick v. Sargent, 696 F.2d 413, 414 (8th Cir. 1983) (per curiam.) Here, there is no evidence that Dingle actually read the incident reports or knew of any risk to prisoner safety. While the reports

*objectively* demonstrate the presence of gangs and racism, there is no hint that Dingle *subjectively* knew of and disregarded that risk. See Jackson, 140 F.3d at 1151 (8th Cir. 1998). Prisons can be dangerous and unpleasant places, but the mere presence of gangs and racism is insufficient to suggest that the risk of violence was obvious. Eighth Amendment liability requires "more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986). Because Dingle's "only connection to the incident appears to be that [s]he is the warden of the prison," Ouzts, 825 F.2d at 1277, Conroy's heirs have failed to demonstrate the actual knowledge necessary to persuade a reasonable jury that Dingle was deliberately indifferent.

## II. Qualified Immunity

Even were Conroy's heirs able to make such a showing, the record does not reflect the sort of facts required to hold Dingle personally liable. For qualified immunity purposes, the critical inquiry is whether it was objectively legally reasonable for the prison officer to believe that his or her conduct would not violate the inmate's clearly established Eighth Amendment rights. See Anderson v. Creighton, 483 U.S. 635, 641 (1987). Prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. See Farmer, 511 U.S. at 844. Qualified immunity protects

"all but the plainly incompetent of those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Here, there is no evidence of the sort of clear constitutional violation required to deprive Dingle of qualified immunity. Given the facts on record, Conroy's death appears to be a sudden and unexpected occurrence. There is no evidence that Conroy or any other prisoner feared for his life or that Dingle knew the prisoners were in danger. As the Eighth Circuit has routinely held, "qualified immunity is appropriate when an Eighth Amendment failure-to-protect claim arises from inmate injuries resulting from a surprise attack by another inmate." Tucker, 276 F.3d at 1001; see also Curry v. Crist, 226 F.3d 974, 978-79 (8th Cir. 2000); Jackson, 140 F.3d at 1152; Prosser v. Ross, F.3d 1005, 1007 (8th Cir. 1995); Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990). Because this case is of that kind, Dingle is entitled to qualified immunity.

Let there be no mistake: Matthew Conroy's death is tragic and regrettable. Yet while prison officials must take reasonable measures to ensure the safety of their inmates, Conroy's heirs have not advanced evidence sufficient to lay the blame at Warden Dingle's feet.

**Conclusion**

Based on the foregoing, and all of the files, records, and proceedings herein, IT IS ORDERED that

1. The Complaint (Doc. 1) against Defendants Lynn Dingle, in her official capacity, and Sheryl Ramstad Hvass, in her capacity as Commissioner of Corrections, is hereby **DISMISSED WITHOUT PREJUDICE.**

2. The Complaint (Doc. 1) against Defendants Fred LaFleur, individually and in his capacity as former Commissioner of Corrections, and John Does I & II, is hereby **DISMISSED WITH PREJUDICE.**

3. Defendant Lynn Dingle's Motion for Summary Judgment (Doc. 21) is **GRANTED.** The Complaint (Doc. No. 1) against Lynn Dingle in her individual capacity is hereby **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 11, 2002

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*